UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Docket No. 20-cr-412 (AT) |
| ) | |
| ANDREW M. BADOLATO ) | |
| ) | |
| Defendant. ) | |

### ANDREW BADOLATO'S SENTENCING MEMORANDUM

In April 2022, Andrew Badolato pled guilty to a one-count wire fraud conspiracy (18 U.S.C. § 1349) for his role in a scheme to defraud donors to We Build the Wall. Andy deeply regrets his conduct ▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

Another significant mitigating factor is his medical situation. Last August, Andy suffered an intracerebral brain hemorrhage (often called an "ICH stroke"). ICH strokes are the deadliest type of strokes (only about 25% of people who suffer one survive). They also frequently recur—only 35% of people who survive the initial stroke are alive five years later. Thus, statistically speaking, Andy's short-term mortality risks are high, and the odds of him surviving a term of imprisonment are low.

Andy acknowledges his guilt. He has begun to make amends for his mistakes through his plea ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ He is a first-time offender who has for years complied with every condition imposed on his release. PSR ¶7. His crime has been the subject of media attention on a scale that few people can comprehend. The offense conduct and Andy's personal circumstances suggest that a three-year term of probation—with a condition of home confinement—and the agreed orders of forfeiture and restitution (totaling $2.8 million) would be "sufficient, but not greater than necessary, to comply with the purposes" of the Sentencing Reform Act. *Dean v. United States*, 581 U.S. 62, 67 (2017) (quoting 18 U.S.C. § 3553(a)).

## BACKGROUND

### I. ANDY'S PERSONAL AND PROFESSIONAL HISTORY

Born in 1964 in St. Petersburg, Florida, Andy grew up in a close-knit, middle-class, Catholic home with his parents, his two twin brothers, and a friend whom he regards as a brother. *See* Exhibit A (E. Reynolds Letter). As a child, Andy was a Boy Scout and an altar boy. He excelled in high school athletics, playing baseball, football, and basketball. PSR ¶112. He continued playing baseball even into college, which allowed him to graduate from St. Thomas University in 1987. PSR ¶114.

Andy married in 1989. He and his wife have since divorced, but not before having three sons together. (They enjoy a good relationship today, as the Court will see from the letter of support submitted herewith by his ex-wife. *See* Exhibit B (M. Hesse Badolato Letter)). As part of the divorce, Andy received sole parental custody of his three boys.

Today, Andy's parents, brothers, sons, and grandsons (he now has two) all reside in Florida. Andy enjoys close relationships with his entire family, who have been as

supportive as possible in the wake of the criminal charges. *See* Exhibits C (K. and P. Badolato Letter), D (M. Badolato Letter), E (W. Badolato Letter), F (S. and D. Badolato Letter), G (R. Badolato Letter),  B (M. Hesse Badolato Letter),

[redacted]

Andy made a career as a serial entrepreneur and consultant. Over the years, he has founded or contributed to several start-up companies and has helped raise millions of dollars in investment capital. *See* Exhibit H (B. Collier Letter). (All while avoiding any material civil litigation.)  Andy and the companies he founded have won awards from the State of Florida for job creation and entrepreneurship. *See* Exhibit A (E. Reynolds Letter). As several letters attest, Andy freely shared his advice and counsel with other small business owners, helping them with business plans and growth strategies. *See* Exhibits A (E. Reynolds Letter), I (J. LaRose Letter), J (G. Loffredo Letter). Until his offense conduct, Andy enjoyed an excellent reputation in the business world. *See* Exhibit K (N. Hutchinson Letter).

Like many other entrepreneurs, Andy's finances have experienced peaks and valleys; he has at times been worth several million dollars, but, today, he has no assets and substantial debts (including legal fees). Given both his stroke and his conviction, Andy's financial future is tenuous at best.

Andy met Mr. Bannon in around 2002. Over time, Andy became more involved in Mr. Bannon's projects, including by vetting the many investment and sponsorship opportunities that were presented to Mr. Bannon as his profile grew. That association came with a cost, as Andy's perceived close relationship with Mr. Bannon increasingly limited his other sorts of business opportunities, especially after 2015. By the time of the offense here, Andy had become dependent to some extent on Mr. Bannon for opportunities.

## II.     ANDY'S ROLE IN THE OFFENSE

Andy first became involved with We Build the Wall in or around December 2018. By that time, Mr. Kolfage had already raised millions of dollars through a Go Fund Me campaign seeking funds to donate to the federal government to build a wall on the southern border. PSR ¶14. But Go Fund Me had expressed concerns that the funds could not, in fact, be used in this way because the Treasury Department cannot accept money for use on a specified project. PSR ¶15.

Andy introduced Mr. Kolfage to Mr. Bannon, who suggested that he create a group that could use donated funds to build the wall itself. PSR ¶18. Andy helped the group to secure legal counsel to incorporate and establish We Build the Wall, Inc. He also worked with Mr. Bannon, Mr. Kolfage, and others to define their respective roles and responsibilities. They agreed that Mr. Kolfage would serve as the Chief Executive Officer and as the group's public face, and that Mr. Bannon would chair its Advisory Board and Finance Committee. Andy signed a contract to serve as a consultant (he was never an officer or director of the group).

Over the next 20 months, Andy helped to recruit advisors (including an auditor), to manage educational and promotional events, to coordinate town halls, to identify and retain

contractors, and to locate land for the construction of the border wall. Andy spent a considerable amount of time onsite in the two communities in which the group was able to build border wall segments. Many members of the community were supportive of these efforts and knew of Andy's concern for the women and children who were victimized by the cartels. *See* Exhibits L (D. Rodriguez Letter), M (P. Roddy Letter), X (K. Donovan Letter).

Andy submitted invoices to We Build the Wall for his services and out-of-pocket expenses, totaling around $174,000 for 2019. These invoices were for legitimate consulting services and incurred business expenses (no one contends otherwise). Thus, Andy did not personally enrich himself from We Build the Wall's funds in the same way as did some of his co-conspirators. *See* PSR ¶¶ 33, 51 & 52 (contrasting Andy's role with the roles of Messrs. Bannon, Kolfage and Shea).[1]

Andy was familiar with We Build the Wall's fundraising efforts. The organization and its principals repeatedly told the media and prospective donors that 100% of the money collected would be used to build the wall and that Mr. Kolfage would not receive a salary. PSR ¶¶ 20-32. Andy knew these misstatements were materially false. In particular, he knew that the organization had always intended to, and was, in fact, paying Mr. Kolfage (including by paying a $100,000 up-front payment followed by monthly salary payments of $20,000). PSR ¶¶34 & 37. Andy also helped to facilitate a few such payments to Mr.

---

[1] Andy also played no role in, and had no knowledge of, the creation of false donor or vendor agreements or the misappropriation of We Build the Wall's funds to Mr. Kolfage's COVID business. PSR ¶¶ 55 (fake donor list and vendor agreement) & 56-59 (COVID relief).

Kolfage. PSR ¶¶ 48-49. And Andy knew that We Build the Wall paid $1 million to an IRC § 501(c)(4) entity affiliated with and/or controlled by Mr. Bannon.



## IV. ANDY'S MEDICAL CONDITIONS

Andy is a 58-year-old male with a variety of serious medical conditions. Exhibit N (Declaration of D. Badolato)[3]; *see also* PSR ¶¶ 107-110. About a decade ago, Andy suffered a heart attack that required surgeons to implant two stents in his heart. *See* Exhibit N, ¶ 8. He also suffers from a variety of orthopedic issues that have necessitated the replacement of one hip, and that likely will soon force the replacement of the other. *See id.* ¶ 9. He also suffers from a variety of other issues, including high-blood pressure, depression, and alcohol abuse. *See id.* ¶ 10.[4]

---

[3] The Declaration of David Badolato refers to hundreds of pages of documentation in support. Given the volume, this documentation has not been submitted with this Memorandum. If the Court wishes to review this documentation, Mr. Badolato respectfully requests leave to provide it to the Court as a supplement to this Memorandum.

[4] Should the Court impose a sentence of imprisonment, we respectfully request that

*(Footnote continued on next page)*

Many of Andy's medical conditions, while serious, do not materially distinguish Andy from other defendants of his age. But one does. Last June, Andy suffered an ICH stroke. *See id.* ¶7. ICH strokes differ from more typical strokes because they are caused by bleeding within the brain. *See id.* An ICH stroke is the deadliest type of stroke. *See id.* Only about 25% of people who suffer an ICH stroke survive the incident. *See id.* Of this group, only 35% are alive five years later. *See id.* Moreover, Andy—like most survivors of ICH strokes—struggles from cognitive difficulties, including difficulty focusing or prioritizing on tasks, problems with short-term memory, and the inability to find words. *See id.* Andy has been undergoing therapy to try to improve these conditions. *See id.* Viewed in combination, Andy's medical conditions require significant medical attention, medication, and ongoing rehabilitation. *See id.* ¶11.

## **ARGUMENT**

A sentence must be "sufficient, but not greater than necessary," to vindicate the "four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 581 U.S. 62, 67 (2017); *see also* 18 U.S.C. §3553(a). A court fashioning a sentence must consider "the nature and circumstances of the offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to serve the four overarching aims of sentencing." *Dean*, 581 U.S. at 67. It also "must … consider the pertinent Guidelines and policies

---

it recommend that Andy be placed in the Non-Residential Drug Abuse Treatment (or Cognitive-Behavioral Therapy) and/or the Bureau of Prison's Residential Drug Abuse Program. We further request that the Court recommend his placement at FPC Pensacola, a facility that has those programs and is in Florida, where Andy's parents, brothers, sons, and grandsons live. *See Substance Abuse Treatment*, Bureau of Prisons, https://www.bop.gov/inmates/custody_and_care/substance_abuse_treatment.jsp (providing program descriptions and location information).

adopted by the Sentencing Commission," *id.*, but not "presume that a Guidelines sentence is reasonable," *United States v. Caver*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc).

Here, we respectfully suggest that a three-year term of probation—perhaps with a condition of home confinement—and the agreed orders of forfeiture and restitution would be "sufficient, but not greater than necessary," to achieve the purposes of sentencing. 18 U.S.C. § 3553(a)(2).

## I.    THE SENTENCING GUIDELINES

As specified in the plea agreement, Andy's Guidelines offense level is 22. He has no criminal history points. Accordingly, the Guidelines suggest a sentencing range of 41 to 51 months, and a fine between $15,000 and $150,000. The Court must take this Guideline recommendation into account when sentencing Andy, but it may not "presume that [the] Guidelines sentence is reasonable." *Caver*, 550 F.3d at 189.

## II.   MITGATING FACTORS REGARDING ANDY'S CONDUCT

In Andy's case, there are several mitigating factors that would justify a below Guidelines sentence—some of which are expressly acknowledged in the PSR, and others of which are not. We respectfully submit that those factors— ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ his more limited culpability compared to his co-conspirators, his family responsibilities, and his medical needs—would together justify a sentence of probation.

### A.    Andy's Acceptance of Responsibility ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

[redacted]

### B.   Andy's Personal History and Circumstances

Andy's personal history and circumstances also reflect mitigating factors that would support a probationary sentence.

### 1.  Andy's Relatively More Limited Culpability

Although Andy does not seek to minimize his role in the offense, his culpability is more limited than that of his co-conspirators. For one thing, Andy did not participate in the apparent efforts by Messrs. Kolfage and Shea to misappropriate We Build the Wall's funds for personal businesses or to falsely claim that 100% of the proceeds of Wall-branded products would go to the organization. PSR ¶¶56-59. For another, Andy had no role in creating false, back-dated documents to conceal past wrongdoing. PSR ¶55. In addition, the monies that Andy received from We Build the Wall were for legitimate consulting services or expense reimbursements and the amounts were reasonable given's Andy's actual work. These payments were no different than payments that We Build the Wall made to other board members, contractors, speakers, or service providers.

Andy's lesser culpability is reflected in his plea documents. For example, the loss amount attributable to Andy's conduct is less than half of the amount attributable to Mr. Kolfage. *Compare* PSR ¶¶ 60 (noting that Mr. Kolfage is responsible for $2.8 million in losses) with PSR ¶61 (noting that Andy is responsible for $1.4 million in losses). Similarly, because his role was more cabined, Andy's forfeiture obligations ($1.4 million), although substantial, are materially less than Mr. Kolfage's ($17.8 million). Although these distinctions in culpability are to a considerable extent obscured by the calculations required by § 2B1.1 of the Sentencing Guidelines, the Court can and should take them into account pursuant to the Sentencing Reform Act.

### 2.  Andy Has Substantial Family Responsibilities

As noted above, Andy maintains close family ties with his parents, brothers, sons, and grandsons. After his ICH stroke, Andy moved in with his parents, both of whom are

in their late 70s. Although his stroke limits Andy's abilities, he can help his parents with basic household tasks like taking out the garbage. He is also able to keep an eye on both (as, to some extent, they do with him, given Andy's medical needs). *See* Exhibit C (K. and P. Badolato Letter).

Andy is also extremely close to his three sons and two grandsons. *See* Exhibits D (M. Badolato Letter), O (K. Trainor Letter), P (T. Green Letter), Q (L. Capasso Letter), R (P. Hennessy Letter), S (B. Gouge Letter).[6] ███████████████████████

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████

### 3. Andy Has Serious Health Problems

Andy suffers from a host of medical conditions. ███████████████████████

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

---

[6] Mr. Badolato has also received letters of support from close friends and associates. *See* Exhibits U (T. Gill Letter), V (T. Thomas Letter), and W (E. Woodson Letter).

███████████████████████████████████████

███████████████████████████████████████

████████████

### III. A PROBATIONARY SENTENCE WOULD ADEQUATELY SERVE THE PURPOSES OF SENTENCING

Andy is an admitted felon; he will bear that label for the rest of his life. In large part due to Mr. Bannon's prominence, the charges against Andy have been the subject of extraordinary media attention. He has already lost much as a result of his own conduct and his future—even setting aside his medical condition—is uncertain at best. A sentence of imprisonment is not required for the purpose of either specific or general deterrence.

#### A. A Probationary Sentence Would Be Just Given the Nature and Circumstances of the Offense and Andy's Personal Characteristics

As set out above, Andy acknowledges his guilt and accepts responsibility for his offense conduct. And while that conduct is serious, Andy has tried to make amends through his ███████████████████████. Moreover, Andy's role in the offense conduct is more limited than that of his co-defendants. Andy is a first-time offender who, for three years now, has complied with every condition of release imposed upon him. He has substantial family obligations, and, because of his ICH stroke, he faces an exceedingly serious, life threating condition. For these reasons, a sentence of probation—coupled, if the Court deems it necessary, with a condition of home confinement—would be adequate to do justice.

#### B. A Probationary Sentence Would Provide Specific Deterrence

Andy has suffered personally because of his conduct. The charges and his perceived close association with Mr. Bannon limited his ability to find gainful

employment—even before he suffered the ICH stroke. This is clear from his financial statement from a year ago (PSR ¶124 (reflecting a negative net worth, which does not include his substantial outstanding legal fees and his diminished earning capacity stemming from the stroke)). Moreover, Andy faces crippling restitution and forfeiture obligations that together exceed $2.8 million. Collectively, the extraordinarily publicity, his status as a felon, and his financial obligations provide an enormous measure of specific deterrence.

Andy's post-offense conduct reflects that he knows well that he made terrible decisions. He has publicly accepted responsibility for his offense—and he has never wavered in this regard. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ And his personal circumstances—he is 58-year-old with no criminal history who has suffered a debilitating stroke—suggest that his risk of recidivism is exceptionally low. *See Simon v. United States*, 361 F. Supp. 2d 35, 40 (E.D.N.Y. 2005) (recognizing that recidivism decreases with age and is not accounted for in the Sentencing Guidelines). Nothing about his history or characteristics suggests that incarceration is necessary to achieve specific deterrence.

### C. A Probationary Sentence Would Provide General Deterrence

As the Supreme Court has stressed, probation is no slap on the wrist. *See Gall v. United States*, 552 U.S. 38, 48 (2007); *see also United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'") (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)). Given the formal and informal collateral consequences of Andy's plea, a sentence of incarceration is not necessary to deter others.

In the public at large, Andy's name will forever be associated with this offense. His arrest, the charges, and his plea have all attracted media attention around the world, spawning multiple stories in high-profile media outlets like CNN, MSNBC, Fox News, *The New York Times*, *The Washington Post,* and the *Wall Street Journal*. Even foreign media sources like *The Financial Times* and the *South China Morning Post* have covered the charges. Andy has lost employment and business opportunities, tarnished his reputation, and incurred hundreds of thousands of dollars in legal fees. Given all of this, a sentence of imprisonment is not necessary to deter the public at large.

## CONCLUSION

For the foregoing reasons, the Court should impose a sentence of probation (with a condition of home confinement, if the Court deems it appropriate), restitution, and a final order of forfeiture.

DATED this 12th day of April 2023.

Respectfully submitted,

*/s/ Kelly B. Kramer*_____
Kelly B. Kramer
Mayer Brown LLP
1999 K Street, N.W.
Washington, DC  20006
(202) 263-3007

*Counsel for Andrew Badolato*