N4QBKOLS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          20 Cr. 412 (AT)
                                           22 Cr. 201 (AT)
5

6    BRIAN KOLFAGE & ANDREW BADOLATO,

7              Defendants.

8                                          Sentence
     ------------------------------x
9
                                           New York, N.Y.
10                                         April 26, 2023
                                           11:00 a.m.
11

12   Before:

13
                         HON. ANALISA TORRES,
14
                                           District Judge
15                            APPEARANCES

16   DAMIAN WILLIAMS
17        United States Attorney for the
          Southern District of New York
18   BY:  ROBERT B. SOBELMAN
          DEREK WIKSTROM
19        Assistant United States Attorneys

20   CESAR de CASTRO
     DAVID DESTEFANO
21        Attorneys for Defendant Kolfage

22

23   MAYOR BROWN, LLP
          Attorneys for Defendant Badolato
     BY:  KELLY KRAMER

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

N4QBKOLS

1              (Case called)

2              THE COURT:  Counsel, please note your appearances,

3     please.

4              MR. SOBELMAN:  Robert Sobelman and Derrick Wikstrom

5     for the United States, and we're joined at counsel table by

6     Christopher de Grandpre, a paralegal in our office.

7              MR. De CASTRO:  Cesar de Castro and David DeStefano

8     for Mr. Kolfage who is to our right.

9              MR. KRAMER:  Kelly Kramer.  I'm here on behalf of

10    Mr. Badolato who is to my right.

11             THE COURT:  Please be seated.  This morning's

12    sentencing hearing concerns two cases, *United states v. Brian*

13    *Kolfage* and *Andrew Badolato,* docket number 20 Cr. 412, and

14    United States v. Brian Kolfage, docket number 22 Cr. 201.  In

15    connection with today's proceedings, I've reviewed the

16    presentence investigation report for Mr. Kolfage, dated July

17    19, 2022, as revised on April 3, 2023, including the

18    recommendation and addendum; the presentence investigation

19    report for Mr. Badolato, dated July 25, 2022, as revised on

20    April 3, 2023, including the recommendation and addendum;

21    Mr. Kolfage's sentencing submission dated April 12, 2023,

22    including letters from his friends, family, colleagues, and

23    others.  Mr. Badolato's sentencing submission dated April 12,

24    2023, including letters from his friends, family, colleagues,

25    and others; and the government's sentencing memorandum, dated

N4QBKOLS

1    April 19, 2023, and the consent order of restitution.  Have the

2    parties received all of these submissions?

3              MR. SOBELMAN:  Yes, your Honor.

4              MR. De CASTRO:  We have, your Honor.

5              MR. KRAMER:  Yes, your Honor.

6              THE COURT:  Are there any further submissions?

7              MR. SOBELMAN:  Not from the government.

8              MR. De CASTRO:  Not for Mr. Kolfage.

9              MR. KRAMER:  Your Honor, we did file under seal an

10   *ex parte*, a supplemental submission, and I just wanted to make

11   sure the Court had an opportunity to see that.

12             THE COURT:  Yes, I did receive it and review it

13   thoroughly.  I am now going to ask some questions.  Please wait

14   until I call your name to give your answer.

15             Have you read the presentence report, and have you

16   discussed it with your client, Mr. de Castro?

17             MR. De CASTRO:  Yes, your Honor.  We received the

18   report and we've discussed it with Mr. Kolfage.

19             THE COURT:  Mr. Kramer?

20             MR. KRAMER:  Yes, your Honor, same answer.  Well, for

21   Mr. Badolato.

22             THE COURT:  Yes.  Have you read the presentence report

23   and have you discussed it with your lawyer, Mr. Kolfage?

24             DEFENDANT KOLFAGE:  Yes, your Honor.

25             THE COURT:  Mr. Badolato?

N4QBKOLS

1          DEFENDANT BADOLATO:  Yes.

2          THE COURT:  Have you had the opportunity to go over

3   with your lawyer any errors in the report or anything else that

4   should be taken up with me, Mr. Kolfage?

5          DEFENDANT KOLFAGE:  Yes, your Honor.

6          THE COURT:  Mr. Badolato?

7          DEFENDANT BADOLATO:  Yes, your Honor.

8          THE COURT:  And AUSA Sobelman, have you reviewed the

9   presentence report for Mr.  Kolfage and Mr. Badolato?

10          MR. SOBELMAN:  Yes, your Honor.

11          THE COURT:  Are there any objections to the

12   presentence report regarding factual accuracy.  Mr. de Castro?

13          MR. De CASTRO:  No, your Honor.

14          THE COURT:  Mr. Kramer?

15          MR. KRAMER:  No, your Honor.

16          THE COURT:  The government?

17          MR. SOBELMAN:  No, your Honor.

18          THE COURT:  Hearing no objections, the Court adopts

19   the factual recitations set forth in the report, each report,

20   and both reports will be made part of the record in this matter

21   and placed under seal.  If an appeal is taken, counsel on

22   appeal may have access to the sealed reports without further

23   application to the Court.  Although courts are no longer

24   required to follow the sentencing guidelines, I am still

25   required to consider the guidelines in imposing sentence.  And

N4QBKOLS

1    to do so, it is necessary that I accurately calculate the

2    sentencing range.  With respect to Mr. Kolfage, there is a plea

3    agreement in this case in which the parties stipulated to a

4    guidelines range of 51 to 63 months' imprisonment, based on an

5    offense level of 24, and a criminal history category of I.  The

6    presentence report contains the same calculation.

7         With respect to Mr. Badolato, there is a plea

8    agreement in this case, in which the parties stipulated to a

9    guideline range of 41 to 51 months' imprisonment based on an

10   offense level of 22, and a criminal history category of I.  The

11   presentence report contains the same calculation.  Based on my

12   independent evaluation of the guidelines, I find that for

13   Mr. Kolfage the offense level is 24, the criminal history

14   category is I, and the sentencing range is 51 to 63 months'

15   imprisonment.  With regard to Mr. Badolato, the offense level

16   is 22, the criminal history category is I, and the sentencing

17   range is 41 to 51 months' imprisonment.

18        Now I will hear from the parties.  First with respect

19   to Mr. Kolfage, does the government wish to be heard?

20        MR. SOBELMAN:  Yes, your Honor.  Your Honor, our

21   submission was detailed, and your Honor is familiar with the

22   facts of the case from the two trials we had for Mr. Shea, so

23   I'll be brief, but of course happy to answer any questions the

24   Court has.

25        Mr. Kolfage, in contrast to Mr. Badolato and Mr. Shea

N4QBKOLS

 1   was committing crimes before the We Build the Wall scheme was

 2   even launched.  As is detailed in the presentence report and in

 3   the government's submission, he was lying to banks.  He was

 4   lying to get loans for home equity.  He was lying to get loans

 5   for a boat.  He falsified bank documents.  He falsified credit

 6   card statements.  He drafted a fake letter from a real person

 7   who works at the U.S Department of Veteran's Affairs.  These

 8   things happen all months before, sometimes a year before the We

 9   Build the Wall scheme was even launched by him and Mr. Shea and

10   others.  That puts him in a different category from

11   Mr. Badolato and Mr. Shea in terms of his culpability, the need

12   for specific deterrence and the government's concerns about

13   recidivism.  I'll come back to the core offense conduct in a

14   moment, but to skip over that to what happened after the

15   defendants were arrested in this case.

16          Mr. Kolfage is also set apart from Mr. Badolato and

17   Mr. Shea.  Mr. Shea, of course, did not accept responsibility

18   for his actions.  He didn't plead guilty.  He went to trial,

19   and his sentencing will be held in June.  Mr. Badolato —— but

20   of course Mr. Shea, as far as the government knows, didn't make

21   public statements, didn't talk to the media, didn't claim that

22   the prosecution was somehow unjust or improper.  He simply

23   denied the allegations against him, as he had the right to do

24   and proceeded to trial.  Mr. Badolato accepted responsibility

25   fairly quickly in this case.  Similarly, did not go on some

N4QBKOLS

1   kind of public offensive against it.

2          Mr. Kolfage's postarrest conduct was highly troubling,

3   and I think both is deserving of punishment, general deterrence

4   and perhaps more importantly is an indicator of potential

5   recidivism and the need for specific deterrence.  As we laid

6   out in our submission, Mr. Kolfage has taken legal

7   responsibility for his conduct by pleading guilty, but has been

8   continuing to send out public messaging that undermines the

9   notion that he really does accept responsibility for his

10  conduct, and made similar statements to the Manhattan DA's

11  office with respect to their separate, but related

12  investigation.  Where he said to them something along the lines

13  of, well, I never intentionally lied to anyone, which of course

14  is contrary to his guilty plea in this case; and contrary to

15  the way in which I think he presents himself in his submission

16  as somehow accepting responsibility fully and being remorseful

17  for his actions.

18          Particularly troubling is the website that Mr. Kolfage

19  launched, Fight for Kolfage.com, by which he claims to have

20  raised tens of thousands of dollars from more than a thousand

21  people based on completely false claims about the government,

22  the nature of the prosecution, the claims in this case, false

23  statements that he's not guilty, when in fact he has admitted

24  his guilt, and smears against the court itself.  It's truly

25  appalling and undermines the cause of justice in the criminal

N4QBKOLS

1    justice system, and is something we think should weigh heavily

2    on the Court in deciding whether Mr. Kolfage truly is a risk of

3    recidivism and should be specifically deterred in this case.

4            To focus for a moment on the conduct, the core conduct

5    in this case.  Mr. Kolfage in his submission tried to paint

6    this as something that sort of arose over time, that he said

7    one thing to the public, but he was doing another in private,

8    and it sort of just happened, that really he set out with

9    Mr. Shea and others to raise money for the government to build

10   a wall.  And literally Government Exhibit 1 at both of

11   Mr. Shea's trials destroy that notion.  It's quoted in our

12   submission, I won't repeat it again, but it is clear from the

13   middle of December 2018, before the GoFundMe goes live that

14   both Mr. Kolfage and Mr. Shea already understand, the

15   government is not going to be able to take the money they

16   raise, and they discuss giving it to themselves, to an

17   organization they control.  And all the communications in

18   December, in January, and going on between Mr. Kolfage,

19   Mr. Shea and his other co-conspirators make very clear that

20   Mr. Kolfage's top priority in launching this GoFundMe, in

21   running the fundraiser in raising millions of dollars is

22   himself.  It's not border security.  It's not a political

23   agenda.  It's not The Wall.  It's not any of that.  He may care

24   about those things.  He certainly said a lot of about them.

25   They're not relevant here, and they're not relevant in this

N4QBKOLS

1    case.  But what is relevant, is his own greed.  And he's

2    someone who of course has suffered a terrible tragedy, who has

3    served our country, and we honor him for that.  We thank him

4    for that.  But it's what he's done since then, the conduct in

5    this case, it's a dishonor to our country, and he's betrayed

6    the trust that hundreds and thousands of people put in him.  He

7    use misused his public profile, and in doing so victimized many

8    different people.  He victimized GoFundMe.  He victimized the

9    We Build the Wall organization, a non-profit.  He victimized

10   some of the people who worked for that organization.  He

11   victimized the donors of that organization.  He victimized the

12   IRS and the U.S. government by doubling down on his fraud and

13   filing false tax returns, including a false tax return he filed

14   after being charged in this district in this case.  It's an

15   extremely troubling pattern of conduct.  That again, started

16   before We Build the Wall, and continued after his arrest in

17   this case.  And the government has real concerns about him

18   being an economic danger moving forward.

19        It's important to note that the most of Mr. Kolfage's

20   offense conduct was committed from his own home, where he is

21   asking to be allowed to remain with a phone, with a computer.

22   Of course he did travel as part of his involvement with We

23   Build the Wall.  He traveled multiple times to the border.  He

24   traveled other places in the country for meetings and for sort

25   of town hall style forums with potential donors and supporters.

N4QBKOLS

At many of those public meetings, he lied to the donors' faces, and reasserted the same lies about how he wouldn't take a cent, he wouldn't take a penny.  He sat on a panel discussion with Mr. Bannon reiterated these, and then Mr. Bannon echoed saying, oh, everyone here that's involved in We Build the Wall, including Mr. Bannon, including Mr. Kolfage, we're all just volunteers.  And around the same time, Mr. Kolfage is sending text messages about wants the 100,000 upfront.  He wants 20,000 a month after that, and every month making sure he's getting his pay, his kickbacks laundered through different entities, including Mr. Bannon's entity, including Mr. Shea's entity.

And at that same time, Mr. Bannon stole more than $1 million from We Build the Wall, with Mr. Kolfage's knowledge, his consent, his understanding, because they were all lining their pockets.  That was what it was set up to do. That was the primary purpose.  The primary purpose wasn't doing some good in the world.  It was to line their own pockets.  And the government again acknowledges Mr. Kolfage's service, thanks him for his service, acknowledge the difficulty with which he lives everyday.  But at the same time, he has to be held accountable for his actions, and the government thinks a custodial sentence and a substantial one is necessary in this case in order to do so.

THE COURT:  I'll hear from Mr. de Castro.

MR. De CASTRO:  Thank you, Judge.  One thing, thank

N4QBKOLS

1    you for letting me speak, Judge.  And I think the first thing

2    I'd like to address is a couple of things Mr. Sobelman talked

3    about which is this concern that the government has for

4    recidivism.

5            First, I think it's addressed in the presentence

6    report that, I mean, statistically he has a very low risk of

7    recidivism.  And in this case, there's no sign that there's any

8    cause for concern.  I know what the government is raising,

9    which I'll address in a minute, that he's going to commit some

10   other crimes.  He pled guilty a year ago, almost a year ago

11   this month.  The government points to no issues related to

12   crimes he's committing.  He was arrested three years ago on

13   this case, and there's been no issues on his supervision, so

14   I'm also a little confused by the government's presentation

15   here a little in that it's almost a presentation after a

16   trial -- and I know they had a trial, but the trial was not

17   against Mr. Kolfage or Mr. Badolato here.  We pled guilty.  We

18   pled guilty before that trial, accepted responsibility, and

19   that should go a long way with this Court, with the system that

20   he has accepted responsibility.

21           We argued in our sentencing submission that the Court

22   should vary substantially, and I note that the government

23   doesn't even acknowledge a variance here.  They'll just saying

24   low end of the guidelines, and we think this Court should vary

25   downward based on his history and characteristics that

N4QBKOLS

1    established that Mr. Kolfage is a remarkable American that made

2    many mistakes.  He made criminal mistakes, but his conduct for

3    the duration of the conspiracy was aberrant behavior.  I know

4    the Court took a lot of issue with that in their memo, and I

5    want to address that.

6           Something the government barely talks about, and I

7    like to spend some time on is the Bureau of Prisons.  And my

8    view based on my experience in this courthouse for many years,

9    my experience with the Bureau of Prisons for many, many years

10   and case law that I do not believe -- and I submit to the

11   Court -- that he is not going to receive appropriate care.  And

12   as we addressed in our memo, the offense, his role in it, the

13   public face of this crime is significant, but it should be

14   acknowledged that -- and the government has argued it

15   throughout and they argued it at a trial and they've argued it

16   all along -- that the real architects are different people of

17   this.  But yes, they've argued that he was the public face.

18   And that, for example, when the organization became an

19   organization before it was just a GoFundMe if you will, that

20   the daily operations were essentially Mr. Bannon and

21   Mr. Badolato.  And so that he made public appearances and he

22   certainly had decision making, we're not the ones saying that.

23   I'm not staying he did nothing.  I'm just saying what the

24   government has said is to acknowledge that his role was less

25   architect, less in terms of the post -- he's the architect of

N4QBKOLS

the first GoFundMe.  But after they started the We Build the

Wall organization and that became a functioning organization,

they had general counsel.  They had counsel.  They had lots of

other people running the day to day.

And Mr. Sobelman is correct.  Mr. Kolfage committed

crimes.  He accepted money.  He promised people that he would

not, and he did.  And he's here accepting responsibility.  This

isn't he went to trial and he's been fighting the charges and

saying none of it's true, and so we have to have a big fight

about the facts.  That's not what we're doing here.  And so I

don't think there's a concern for recidivism.  I think -- and

sort of the last point we made, which I can address very

briefly later, is the statistical analysis, which is important

the Court has to consider, what sentences are normally given

out for this type of fraud, this number in our district and in

our circuit, and nationwide.

But in terms of just to sort of address and get out of

the way, the concern about protecting the public, which I think

speaks to this recidivism point.  I think as probation notes

and as we've noted, I think the likelihood of recidivism here

is extremely low.  But so turning to his history and

characteristics.  I know the Court has read carefully and

considered the parties' submissions.  But allow me at least to

highlight sort of parts of our submission that I think are

important.  Despite the government's claim that because this

N4QBKOLS

1    fraud in this case lasted a period of years that somehow

2    defeats our argument that he's otherwise led a law-abiding

3    life.  We never made an argument that he didn't commit crimes.

4    We never made an argument that this was a one-off, one day, one

5    crime.  No, we've acknowledged the conspiracy.  But arguing

6    that his conduct is aberrant, the government seems to take

7    great offense that we're saying look at Mr. Kolfage's whole

8    body of work.  Look at his life.  The government has not

9    presented the Court with any arguments about him having a

10   lifetime of crime.  To the contrary, it's this case and the

11   related tax case, and it is related.  It's the, not reporting

12   the income from this case.  Obviously, he's not a repeat

13   offender.  His military service we've laid out in our

14   submission and is laid out in the PSR, but it's notable he had

15   two tours in Iraq.  He voluntarily enlisted in January of 2001,

16   and he was deployed to Kuwait, and then he volunteered in

17   August of 2004, for a second tour.  Fourteen military

18   commendations.  They were not given to him because of his

19   injuries.  It wasn't, oh, look at what he suffered, let's give

20   him commendations.  They're for his valor at different times,

21   at different times during his service, including the

22   Purple Heart and the Air Force commendation medal.

23         His injured suffered in 2004 are apparent.  They're

24   well-documented.  We discussed them, and they changed his life.

25   But the argument that the government made in their submission,

N4QBKOLS

which of course this is my opportunity to respond to it, is
that he led a double life.  But following his injuries after
dozens and dozens of surgery and rehabilitation, he showed
remarkable resolve.  It's amazing that he survived, and he
dedicated his time to helping others similarly wounded and
disabled to come to terms with their new realities and provide
a source of inspiration.

         The government likes to cite to Judge Marrero's
opinion about white collar defendants, the double lives they
lead.  That really couldn't be farther from the truth as it
relates to Mr. Kolfage, and I'll tell you why.  Certainly he's
committed the offenses here. Is he a lifetime fraudster?  Is he
a Ponzi schemer?  No.  Judge Marrero and many judges point out
that many white collar defendants, wealthy individuals commit
crimes.  They become the pillars of their community, and they
live these double lives.  They're wonderful to their family.
They donate to charities.  They're out in the public eyes doing
things.  But they become pillars to their community by donating
money to charities and religious institutions and the like by
virtue of the health that they obtained, sometimes through
ill-gotten gains.  Sometimes not, and sometimes a combination
of those.  It's usually their wealth, prestige and financial
generosity that's cited in the sentencing mitigation
submissions that you see regularly in this district and across
the country.

N4QBKOLS

1          But what distinguishing Mr. Kolfage from those

2    defendants is the generosity of time and effort to those around

3    him.  We presented a very tiny little portion of what he does

4    to provide inspiration.  That makes this fall even bigger

5    because he is an inspiration to so many who are struggling with

6    their disability.  He spent countless hours with wounded

7    warriors, amputees, children, adults, all in an effort to help

8    those similarly situated.  And he measures his charity, unlike

9    a lot of those defendants, who measure them in dollars, he

10   measured them in time devoted and the lives that he can help

11   and that he can change and that he can inspire.  That makes him

12   truly different than many of the white collar defendants that

13   come out.

14          Every white collar defendant in this case under 2B1.1

15   the government argues the same.  Greed, of course.  It's a

16   crime, and we acknowledge it, but that doesn't end the

17   discussion.  They cite to *Regensberg*, which I mentioned, and

18   he's materially different than *Mr. Regensberg*.  He was

19   perpetrating a Ponzi scheme.  People had known him for years.

20   He defrauded members of his synagogue that he held a position

21   of authority in.  He acted alone.  He was conceiving and

22   perpetuating a fraud against victims he knew and pocketing all

23   that money himself.  I cite all those factors because those are

24   the factors that Judge Marrero cited when he made the comments

25   they chose to pluck out and put into their submission.  All

N4QBKOLS

those factors were extremely important to Judge Marrero.  The

case is not analogous, but I understand why the government

might use that, because he went on -- Judge Marrero went on to

discuss the arguments that white collar defendants generally

make.  Stressing that his arguments were not uncommon, but they

were very common.

         But *Regensberg* went to trial.  He denied that he

committed the crimes.  And if he did it, he said it was because

he was suffering from a pathological gambling addiction, making

excuses for his conduct for defrauding those closest to him.

Is that Mr. Kolfage here?  Those are not the facts here.  Those

are not.  He pled guilty, accepted responsibility a year ago.

And I submit to the Court that Judge Marrero was not talking

about a defendant like Mr. Kolfage when he wrote that opinion.

         I want to take a minute to discuss the government's

repeated and lengthy reference to Mr. Kolfage's use of social

media to attack this case.  First, most of what they cite is

from 2020, well before even our involvement in the case.  He's

not the first defendant in a high profile matter to lash out

when he perceive that he was being demonized.  He's not the

first.  He will not be the last.  And as social media continues

to perpetuate our communities and our lives, unfortunately in

my opinion, people lose a filter, and people lash out

sometimes.  And in our day where people read the news today and

forget it tomorrow, it gives people more comfort to just tweet

N4QBKOLS

1    or do whatever it is, whatever social media platform they like

2    to use.  And I think that's concerning for our society, but I

3    think it's not uncommon in his situation, but he'll address a

4    little bit of that himself.  It doesn't represent some contempt

5    for this court or the government that has any bearing on his

6    likelihood to reoffend or ability to be rehabilitated.  I don't

7    think the government is arguing that this Court should punish

8    him harsher for statements he made prior to pleading guilty

9    that didn't exhibit an acceptance of responsibility.  I don't

10   think they're staying that.  I hope not, because I don't really

11   follow that argument.  Yes, he's saying I'm not guilty.  Yes,

12   I'm going to fight the case. Everybody is demonizing him

13   throughout the country and he says those things.  Okay, fine.

14   But he accepted responsibility.  He came in publicly and

15   accepted responsibility.  Fair game.  In my view fair game for

16   those statements that he pled guilty, after he pled guilty and

17   then there's those statements.  We're talking about very few

18   posts, and he was not avoiding responsibility.  And the

19   government cites these notes from a meeting Mr. Kolfage had

20   with the New York County District Attorney's office.  Following

21   his plea, somehow it seems presumably suggesting that

22   Mr. Kolfage is really not accepting responsibility, and did not

23   to even a brother or a sister organization.  But it's

24   interesting that they really don't continue that thread,

25   because they don't inform the Court about the results of the

N4QBKOLS

interview.  Did the DA's office slam the door in his face?  No,
we were present.  And I think the notes, it's something out of
context.  Notes are notes.  Notes are there to remind me as the
note taker or the Court as the note taker what happened during
the meeting, and sometimes they're not 100 percent accurate.
They're not a transcript.  What were the results of the Bannon
or the DA's office investigation?  Well, Bannon was facing
prosecution here.  Mr. Bannon was facing prosecution here, and
President Trump pardoned him.

        After Mr. Kolfage pled, New York County came knocking.
New York County has indicted Mr. Bannon.  And who did they
utilize to do so?  The man sitting next to my colleague.  He
testified in New York County grand jury, and Mr. Bannon's been
indicted.  So the notion that he hasn't accepted
responsibility, the DA's office believes apparently what he has
to say, and he has not said -- and he's not said to this Court.
We have not said it in our submission, and he will not say it
today, oh, I didn't do anything wrong.  That's just not what
happened.  And so one note that one assistant district attorney
took I don't think carries the day here.

        Let me turn to medical care or lack of medical care
that I think Mr. Kolfage will struggle to receive from the
Bureau of Prisons.  The government and probation gives sort of
relatively short attention to what I think is probably one of
the biggest issues the Court faces with Mr. Kolfage's

N4QBKOLS

sentencing.  I know if I were in the Court's position, this

would be a huge issue for me, as it was for Judge Caproni in

another case that I had.  And essentially the government argues

that, well, the Court should lower Mr. Kolfage's sentence 12

months within the guidelines because of his medical conditions

and his service.

        But in our submission we argue that sentencing

Mr. Kolfage to imprisonment here is taking a big gamble, a

risk, and I don't say that lightly.  The government criticized

our submission heavily on this point pointing out sort of in a

footnote that we don't have any basis.  For example, a footnote

saying that, we don't have any basis regarding medications, and

how the Bureau of Prisons is not going to take his medications.

But as it knows as one often has to do, including the

government in many, many circumstances, we must draw in our

experience with the Bureau of Prisons to formulate our

opinions.  And I've had many experiences with clients, the

Bureau of Prisons and medical care over the years that I've

been practicing in this court.

        But for me, the pandemic really exposed the BOP's

weaknesses in this regard, given the amount of compassionate

release litigation we were all engaged in around spring of

2020.  I feel like those were years of just compassionate

release I felt like is all we were doing.  And most of it

focused on medical care, at least the cases I was dealing with

N4QBKOLS

were on, Are you going to receive, you client, receive

appropriate medical care and/or issues related to Covid.  And

they're born from experience, and for me it's recent

experience.  So as I've cited in our sentencing memo the issue

with my client *Mr. Wilbright*.  He is confined to a wheelchair.

He was supposed to be designated to a medical facility.

There's no room in a medical facility so he surrendered. He was

in a camp.  I was getting calls daily from his family that he

was essentially in the SHU; and, oh, he arrived with his

medications, and they took his medications away.

It's not that I think the Bureau of Prisons did

anything mean or malicious or anything like that.  I know from

hearing from correction officers directly speaking to me that

the policy is, yes, we want you to bring your medications.  We

want to see what you're on, bring them, and then we evaluate

you, and our doctors will re-prescribe you if we think it's

appropriate or not.  So those medications essentially go in the

garbage.  For my client *Mr. Wilbright*, that meant weeks and

weeks of waiting for those evaluations, and it took I think

more than two months before he was finally sent to a medical

facility.  And they had to transport him to do it and that took

a lot of time as well.

But the Bureau of Prisons for Mr. Kolfage as we've

argued, it is an extremely heavily lift to care for him.  And

in a case that I had before Judge Gardephe, which was a trial

N4QBKOLS

1    matter for which the defendant surrendered post-conviction,

2    immediately upon conviction, who the Bureau of Prisons could

3    not handle her anemia.  That's the issue.  And it got so bad

4    that Judge Gardephe had to bail her so that she could be

5    treated, so that she was not rushed to hospital several times

6    for blood transfusions, because the Bureau of Prisons would not

7    affirm to the Assistant U.S. Attorney or to the judge that they

8    would provide her with B12 injections, B12, non-narcotic, just

9    the vitamin just to make sure she had what she needed.  She

10   went to the emergency three times for transfusions.  She was

11   released.

12           Judge Gardephe recommended a medical facility.  She

13   went to that medical facility.  I spoke to the jail.  She spoke

14   to the jail, please bring your medications.  She brought her

15   medications -- garbage.  They noted them, and then put them in

16   the garbage and said, we will either try to find something

17   similar, or we'll prescribe just this, but it's own going to be

18   after weeks of our evaluation.  Well, the short story on that

19   is a three-year sentence turned into a six-month sentence

20   because they could not handle it.  And all they needed to do

21   again was treat her anemia, and she had to have a spinal

22   surgery in between so she had some concerns, they couldn't

23   handle it.  So they released her to a halfway house in New

24   York, who promptly went literally the day she arrive said, you

25   need to go home.  We can't handle your care.  And this is not a

N4QBKOLS

1   person confined to a wheelchair.  This is not a person on

2   narcotics.  They could not handle it.

3           So I say all that because, yeah, I don't have

4   documented evidence from the Bureau of Prisons, but I have 20

5   years of experience dealing with the Bureau of Prisons to draw

6   on, good and bad, and so I ask the Court to draw on its

7   experience as well.  And on that point, the government

8   provides, as it often does, a letter from the Bureau of

9   Prisons.  And I don't fault the government for doing that.

10  They should of course reach out to the Bureau of Prisons, but

11  that letter, as I read it, is the same letter that I received

12  in so many cases. It's a form letter that tells you about the

13  levels of care and basically inserts Mr. Kolfage's information.

14  It doesn't answer.  To me there's more questions as a result of

15  that letter.

16          The devil is in the details, and I think the

17  collective experience, probably everybody in this room is that

18  the Bureau of Prisons is not the easiest organization to deal

19  with, but they do not answer any of the questions.  How are

20  they going to with the debilitating pain he has from sciatica?

21  The stabbing that he feels that goes on every 60 seconds for

22  days at a time, and the way that's handled is with narcotics.

23  And for you, me, anybody else walking who develops sciatica, it

24  can be debilitating, but it can be managed.  The difference is

25  our nerve have not been severed.  He's at the end of what might

N4QBKOLS

1   be a lifetime of struggle with sciatica.  He's getting that

2   brunt.  And if he does not have those narcotics, he can't go

3   on.  It's very, very -- it's impossible for him to sustain that

4   pain.  He has tried.  He's so concerned about being addicted to

5   opioids, as we all are, and he has tried to even taper it down

6   at times in his life.  He can never go without it, but he tried

7   to taper it down.  Impossible.  They've tried all the

8   alternatives they can.

9        My experience with the Bureau of Prisons is they have

10   told me on other cases for other clients, they're not giving

11   narcotics.  They're not doing it.  Our clients struggle

12   sometimes to get Ibuprofen.  I don't know -- and the Bureau of

13   Prisons certainly doesn't address it in their letter.  They say

14   we're aware of his condition, great.  We can handle it.  Well,

15   they don't answer why they couldn't handle my other client with

16   anemia, a very, very simple condition to deal with and they

17   couldn't handle it at all.  Not to mention that, it will take

18   them weeks to determine it.  I know that the letter also says,

19   Please provide all the medical records.  Well, apparently they

20   didn't receive them.  I guarantee to you Mr. Kolfage were to

21   surrender, I will try, but it usually takes me weeks before I

22   can get medical records in the hands of somebody to understand

23   what someone's true condition is.

24        So some of the things that the government has

25   addressed in terms of the nature of his offense and things like

N4QBKOLS

1    that, I've addressed in our submission, and I addressed a

2    little bit here to the Court as well, but there is one point.

3    So the government is sort of asking you to enhance him from

4    this other conduct, which is again my feeling like, Did we have

5    a trial?  Was this 404 evidence that I didn't see?  I'm aware

6    of it.  We had extensive discussions about it in our plea

7    negotiations.  And in their footnote they raise this issue of

8    this obstructive conduct and talk about how it wasn't

9    necessarily fully developed.  It seems to be fully developed

10   enough that we had plenty of communications for months about it

11   when we were trying to negotiate a plea so that Mr. Kolfage

12   could save the Court and everybody else the time of a trial

13   here.

14         But for all those reasons, I think the Court --

15   there's many reasons the Court would vary here, and I think for

16   me the reason we made the recommendation for no jail -- and I

17   don't make that recommendation very often in the cases I do is

18   because I don't know how.  One, I think the Court is well

19   within applying the factors to vary below the 51.  And then

20   it's how can this person be sentenced to the Bureau of Prisons

21   and be able to do time and not do time as medical torture.  And

22   that's what I'm very worried is going to happen, and I'm going

23   to be before the Court in two months after his surrender

24   saying, he hasn't gotten any of the medical care he needs.

25   He's having this pain every minute, and they will not give him

N4QBKOLS

1   any narcotics to deal with it, and then I'm going to be force

2   to be making compassionate release motions.  On sort of

3   sentencing disparities, the government's only counter to our

4   statistics regarding sentences in this circuit is to say that

5   he was motivated by greed.

6          Well, other than some sort of legitimate need for

7   money, it's not really a distinguishing factor under 2B1.1.

8   It's hard because that new tool that allows us to look at all

9   the statistics is so hard to find out the details of the other

10  women. We don't really know what the subset of cases is, but I

11  don't think I've ever had a case or read a decision in a fraud

12  case where the government didn't make some sort of greed

13  argument or variation on that, and we're not fighting that.

14  And I think most of the cases are -- that's the driving factor.

15  But as statistics go, I'd wager that Mr. Kolfage's medical

16  needs would almost be unparallel.  And his true devotion to

17  helping others overcome their physical disabilities, as well as

18  the mental disabilities and despair that come with these

19  significant injuries distinguishes him from any of the

20  defendants in that subset, in that subset where the median

21  sentence is 15 months.

22          For all those reasons, we urge the Court to impose a

23  non-incarceratory sentence for Mr. Kolfage.  Thank you, Judge.

24          THE COURT:  Mr. Kolfage, would you like to say

25  anything?

N4QBKOLS

1          DEFENDANT KOLFAGE:  Yes, your Honor.  Remorseful,

2     disgusted and humiliated are just some of the words that

3     describe my actions in this case, and what I take full

4     responsibility for.  I told people that I would not take any

5     money as part of the GoFundMe campaign, and I did.  It was

6     wrong, a crime, and the worst decision I've made in my life.

7     I'm deeply sorry for my actions.  Leading up to creating this

8     GoFundMe, I had the idea that maybe I could unite Americans

9     like Congresswoman Gabby Giffords did who I had the honor of

10    working with and do something great.  This wasn't about

11    building walls.  It wasn't about some elaborate scheme to take

12    $20 million for myself, it was about putting the spotlight on

13    our broken immigration system as a whole and attempting to

14    unite the country for a greater good.

15          The GoFundMe was a vehicle to raise awareness.  I was

16    sick and tired of seeing political sides using migrants as

17    pawns and never resolving the issue at hand. I'm the product of

18    two separate families who emigrated here. My mother's side from

19    Mexico.  My father's side from Canada, two generations ago.  I

20    thought maybe I could be the catalyst to spark the change that

21    would get our elected officials to overhaul our immigration

22    system.  Maybe I could use my injuries for a greater good that

23    would impact people around the world, just not the United

24    States.  This was my true intention.  My behavior of helping

25    others over the past 20 years since being wounded is proof of

N4QBKOLS

1    my character.  However, I grossly misjudged the immediate

2    impact this GoFundMe would have and the mass amount of funds

3    that it would actually generate over night.  It took off, and I

4    wasn't prepared in any way to manage such a large project,

5    which is why I sought out help.  I even went to the U.S.

6    Capital to meet with members of Congress and Senate to figure

7    out how to make this happen.  I was met with closed doors and

8    dead ends as I rolled around seeking help from these elected

9    officials.  I was in way over my head at this point.  I say

10   this not to justify my actions, they were wrong, and I have

11   admitted my crimes.  I say this only to give the Court some

12   context of my bad decisions.  Anyone who knows me personally

13   knows how deeply invested I am in this country.

14          The events that took place on September 11, 2004, are

15   vividly in my thoughts like it was yesterday, and the reason

16   I'm so passionate about this country.  I was laying mangled

17   bleeding out on the sandy Iraqi soil, fully awake, seeing my

18   right hand hanging by a few threads of skin and knowing my legs

19   were gone as my blood splattered all over my closest friends.

20   Surely they thought I was dead and the look on their faces are

21   burned into my memory today.  This impacted every single

22   decision that I make in my life today.  Every morning, the

23   moment I wake up and attempt to get out of bed, but cannot

24   without assistance, I'm reminded of the dreadful day. It's a

25   nightmare that never ends.

N4QBKOLS

          I had great mentors leading up to this point in my
life like democrat Congresswoman Gabby Giffords.  I learned a
lot from her. And although our political views may not always
align, she taught me the importance of uniting people for a
greater good.  I was suppose to attend an event where she was
shot, and I would have been by her side that day.  I was spared
my life again.  Tragedy is what unfortunately I know.  It's
followed me throughout my life.  I just wanted to help people.
That's it.  It shaped who I am today.

          And I don't always properly filter my comments,
whether in public or private.  Following my indictment, the
government is right.  I made a lot of public comments on social
media.  There was a media storm surrounding this case like
nothing I had ever been apart of.  And the focus of many was to
demonize me, and I've never been in this situation before.  I
reacted badly.  I made some really bad choices and will forever
live with those consequences.  I use to be known as the war
hero, who was inspirational.  I've now tarnished this for life.
This behavior and actions are not in my character.  This is not
who I am as a person -- then, not now.  Some people who don't
take the time to know me personally misunderstand my deep
passion and love of our country as arrogant and aggressive, but
it's not.  I'm just very passionate about our country because
what I went through as being such a traumatic event.

          I don't want what happened to me to be in vain and for

N4QBKOLS

nothing.  Sorry.  I made the promise not to personally benefit,
not anyone else, and I broke that promise.  I let many down.  I
let the donors down.  I let my family down, and I've been
humiliated by my poor decisions.  Three years have pass since I
made these mistakes, and it's weighed on me heavily every
single day.  Not a day has passed where I haven't asked myself
how did I allow this to happen.  Why did I do this?

          I'm blessed with such a great, caring young family.
Everyday I'm able to teach them new things and watch them grow
is all I look forward to now.  My children are old enough now.
They can see and understand the struggle I face daily in our
home, something that no one else sees.  No one gets to see that
struggle.  It's personal.  People only see me as this person in
a wheelchair missing all his limbs, who appears to be having
such a great life and always smiling.  There's only one reason
I'm able to live any semblance of a stable life today, and it's
due to my family.  They are my support system.  They are there
to pick me up when I'm down.  They assist me every single day
with mundane things that everyone takes for granted, things
like getting dress, zipping up my jacket, buttoning my shirt
and my pants.  That's just the basics.  I won't go into the
rest of the very personal things they do for me.  Having them
in my life is the only reason I'm able to help others today.

          Everyday is a battle for me.  On a regular basis, I
face things that would make most grown men consider giving up

N4QBKOLS

1    their lives.  No one can even imagine what it's like, and this

2    is exactly why for the past 20 years I have devoted my life to

3    helping others to overcome their challenges, because I face

4    these demons all too often.  My life has continually been

5    spared from very traumatic life and death events for some

6    reason.  I don't know why.  Maybe this is my purpose just to

7    help others.

8           All I can do is admit my faults, learn from them and

9    grow, and use it to assist others who may be suffering from

10   something in their life.  I'm positive the good I will do

11   following this chapter in my life will greatly outweigh all the

12   bad choices I have made involving this case.  I will continue

13   to help people overcome their challenges just as I did before.

14   I ask the Court for leniency to see the real me beyond the

15   facts of this case.  Thank you.

16          THE COURT:  I'll hear from the government with respect

17   to Mr. Badolato.

18          MR. SOBELMAN:  Your Honor, Mr. Badolato had a

19   different role than Mr. Kolfage.  While Mr. Kolfage was very

20   public, Mr. Badolato was behind the scenes in the shadows.  He

21   played a central role in the scheme.  It was he and Mr. Bannon

22   who principally came up with the precise way that they would

23   funnel money out of the organization to Mr. Kolfage and to

24   others.  And Mr. Badolato worked mostly at Mr. Bannon's

25   direction to make it all happen.  He was the one that -- sort

N4QBKOLS

of the connective tissue between Mr. Kolfage, Mr. Bannon, and
to some extent Mr. Shea and others in perpetrating the scheme.
He was the one who made sure the kickbacks got paid on
schedule, help figure out what passthrough vehicle the
laundering of the funds would occur.  And he knew that what was
being said were lies, and he was one of the people, him and
Mr. Bannon that suggested the way in which Mr. Kolfage would
lie, and he was the one who spoke directly with Mr. Kolfage
about what should be said to the public, how it should be said
to the public and donors.

        Mr. Badolato is, as I mentioned earlier, differently
situated than Mr. Kolfage, Mr. Bannon, Mr. Shea in a couple of
ways.  One, he didn't profit as much as Mr. Bannon, Mr. Kolfage
or Mr. Shea did from the scheme.  He was paid sort of a fixed
fee monthly for his consulting, and he did do a number of sort
of legitimate work for the organization as well in helping
build the portions of The Wall that were built on the
properties that We Build the Wall owned or controlled, and had
a pretty large role almost in the government's view sort of a
chief operating officer, but without necessarily the title or
all of the authority.  Mr. Badolato also hasn't made public
pronouncements about the case after his arrest, after his
guilty plea, and the government has much less concern about his
recidivism or specific deterrence with respect to him than we
do with respect to Mr. Kolfage.

N4QBKOLS

1          Your Honor, we recognize that Mr. Badolato suffers

2     some health challenges and sets forth some mitigating factors

3     in his submission, some of which are under seal so I won't

4     discuss them unless your Honor has questions about them, but we

5     do think a substantial incarceration sentence is called for in

6     light of his conduct, although we do think the Court should

7     credit him for early acceptance of responsibility and give him

8     whatever consideration the Court deems appropriate for his

9     health challenges and other difficulties.

10          THE COURT:  Mr. Kramer.

11          MR. KRAMER:  Thank you, your Honor.  Thank you, your

12     Honor, for the opportunity to address the Court today.  Like

13     every defendant, Andy Badolato is many things.  He's a dad.

14     He's a son, a brother, a businessman, a patient, but he's also

15     a felon, and that's why we're all here together today.  And so

16     I'd like to talk about that a little bit because as you've

17     heard from the government here, Andy owns this crime and

18     accepted responsibility for it in a way that's unique among his

19     co-defendants past and present.  I'd also like to talk a little

20     bit about how Andy responded to his arrest.  Because again,

21     Andy's role is quite different.  It tells you a little bit

22     about his personal circumstances and his personal qualities.

23     And the summary is that he responded exactly the way that you

24     would want a defendant to respond.  This is a man who accepted

25     responsibility, indicated early on that he was prepared to

N4QBKOLS

1   assist law enforcement, and took substantial steps to do so.

2   And I won't go into details unless the Court has questions

3   about that, but it's an important distinguishing factor in this

4   case, and I'll speak more about that in a minute.

5        I'll also need to talk to you a little bit about

6   Andy's health.  As you heard from the government, Andy's got

7   some serial health challenges.  Some of them are routine for a

8   50-plus year old man.  The stroke he suffered last year is a

9   completely different animal.  And I have to tell the Court that

10  I have not been face to face with Andy since that happened

11  until today, and there was a night and day distinction where I

12  just feel like I have to flag that.  I also will talk a little

13  bit about Andy's family responsibilities.  And I do want at the

14  outset to acknowledge that we mentioned Andy's son in our

15  pleadings.  We mentioned that he was on track to graduate from

16  his program, and that he hoped to be able to live with Andy.

17  He's in the courtroom today.  And I just wanted to acknowledge

18  that and thank him for driving up with Andy.  I know how much

19  Andy appreciated that support in this really difficult time.

20       So let me go back to the offense conduct because again

21  that's why we're here.  Andy pled guilty to a wire fraud

22  conspiracy, and he pled guilty to a conspiracy because he's

23  guilty.  He knows that.  He owns that.  It's his epitaph.  That

24  is the reality of his life today.  So what happened?  How did

25  this go wrong?  Well, Mr. Kolfage came up with what seem to be

N4QBKOLS

1    a great idea.  He tapped into something sort of deep and

2    important for many people believed honestly and in good faith

3    that a wall on the southern border would help with crime and

4    help with immigration.  And he went public with that idea, and

5    obviously he raised a huge amount of money.

6          And the media started to look at Brian a little more

7    closely.  They wanted to understand who Mr. Kolfage was, and

8    they raised some questions about him, Could we trust the

9    donations would go to the right place.  Andy knew about that.

10   He did.  He talked about it with Mr. Bannon. And Mr. Bannon

11   said, that's not a problem.  I'll pay him myself.  And at first

12   that gave Andy some comfort because it meant that if Mr. Bannon

13   was paying Mr. Kolfage with his own funds, that the statements

14   might not be false, that the statements might be true.  He

15   wasn't getting paid by We Build the Wall, that he was being

16   paid by a private donor.

17         And then Mr. Bannon wrote a $100,000 check from his

18   501 C4 or whatever the technical description is.  And guess

19   what that check did, it bounced.  There's no money.  And that's

20   when Andy knew he had a problem, because that's when Mr. Bannon

21   started to call him to say, you need to wire We Build the Walls

22   funds to my entity.  And that's when Andy knew that the lies

23   were lies.  It made him uncomfortable, but he never did

24   anything to stop it.  And in fact, he went on, as you heard

25   from the government, he did facilitate some of these payments

N4QBKOLS

as well.  He was the middleman.  He was stuck between two

sides.  All told, Mr. Bannon received more than a million

dollars from We Build the Wall, and Mr. Kolfage received more

than $350,000.  As you heard the government mention, Andy's

situation is different.  Andy entered into a consulting

contract with We Build the Wall.  It was approved by the board.

He provided legitimate consulting services.  He was on the

ground in the places that they were interested in building.  He

was working on Wall-a-Thon.  He was paid something like

$174,000.

         As the government put it in their sentencing papers,

the benefits paled in comparison to his co-defendants, so his

role is quite different.  So was he part of the scheme,

absolutely, 100 percent.  He owns that.  But was he the leader?

Absolutely not.  Was he one of the primary beneficiaries?  He

was not.  So he's made some clearly terrible decisions, and

that's why we're here today.  He's a felon, and that's our

starting point.  But let me tell you a little bit about what

Andy did when this offense was discovered.  After Andy was

arrested, I spoke with him almost immediately, and he made some

difficult decisions.  One of the things that the Court might

recall, I believe your Honor actually may have warned the

parties at the time, there were a number of inflammatory

statements made when this case was indicted.  Andy didn't do

that.  Andy said nothing.  He didn't say, like Mr. Bannon, that

N4QBKOLS

this case was a fiasco and a political hit job.  He didn't say

that.  He didn't say that this was an effort to intimidate

supporters of President Trump.  That's not what Andy said.

Andy said nothing.

          And he didn't say, like Mr. Bannon did, just a couple

of months ago in the New York case that the whole thing was a

sham.  Andy said nothing because he decided right away.  He

decided right away that he needed to accept responsibility for

this.  He needed to try to find a way to cooperate with the

government.  He needed to find a way to try to make it right,

and that's what he set out to do.  And you know from the Sil

submissions I think to some extent at least what Andy's able to

say substantively about what happened in this case, about the

leadership here, and I won't go into details unless the Court

has questions because I have no understanding of where the

state court really sits and whether there can be any prejudice

to it, so I don't want to address it in open court.

          Now the government credits Andy in its sentencing memo

with providing truthful and accurate information about the

offense conduct, but it elected, as its right, it's total in

its right not to file a 5K, and I'm not complaining about that.

I just want to be clear.  I'm not suggesting that there's

something bad faith or improper about that.  That's the

government's decision.  It's a unilateral one. They're entitled

to make it.  But if you look at the sentencing memo, they

N4QBKOLS

 1   explain that one of the chief reasons that Andy did not get a

 2   5K is that under the unique facts of this case, he wasn't able

 3   to provide substantial assistance.  And here's a quote, While

 4   he, meaning Andy, had information about the involvement of

 5   Bannon and Kolfage in the charged offense conduct, Bannon was

 6   pardoned.  And the information about Kolfage was not additive

 7   (and Kolfage ultimately pled guilty).

 8           And that brings us to the elephant in the room.

 9   Bannon was pardoned.  A single defendant plucked from the case

10   before he'd even gone to trial.  Why?  Well, it didn't have

11   anything to do with the evidence.  As the Court's heard,

12   Mr. Bannon was both the leader of the scheme and the primary

13   beneficiary.  So the pardon wasn't about the facts.  I've got

14   my views, but the Court doesn't need to go there as to what was

15   really going on.  But the Court does have to answer a question,

16   which is this:  What does the pardon mean for Andy?  Does it

17   mean that Andy didn't do the work; that he didn't come

18   prepared; that he didn't tell the truth; that he didn't meet

19   with the government eight plus times?  I don't think it means

20   that at all.  Andy did what he could to cooperate.  He couldn't

21   control a pardon granted by the former president.  And I

22   respectfully suggest that the Court shouldn't hold that pardon

23   against him, because it's not his fault.

24           I suggest that the Court should credit Mr. Badolato

25   for what he did, because that's how our system works.  As a

N4QBKOLS

defense attorney I need to be able to tell clients, the

cooperation has benefits.  I need to be able to make

representations.  It's not going to be a pardon.  You don't

have to worry about that.  The system is fair.  And when that's

undermined, and when that's undermined we find ourselves in a

very difficult situation.  The government talks a bit about

general deterrence in its memo.  I don't disagree.  General

deterrence is also important, but I also think the message in

this case, as it relates to Andy, is somewhat unique because

the Court has an opportunity to send the message that it's

true.  People who cooperate in good faith who provide truthful

and accurate information about their role and about their

co-defendant's role, including a very powerful, very powerful

political figure, receive the benefit for that when it comes to

sentencing. It's a very important message and I urge the Court

to do that.

        And legally, of course, there's two ways for the Court

to do that.  First, the Court can consider Andy's efforts,

because under Second Circuit law, they clearly go towards his

personal history and characteristics.  So the Court can

consider that as part of the normal Sentencing Reform Act,

Section 3553 factors.  And I'd be remiss not to point out that

this isn't the first time that Andy has cooperated with federal

authorities.  We noted in a footnote a prior case from ten plus

years ago where he was not implicated at all, but he was asked

N4QBKOLS

1   by the FBI to assist and to engage in proactive cooperation

2   regarding legitimate mafia associated character.  He did it.

3   He wore a wire.  He recorded conversations, at some risk that

4   the recordings demonstrate a threat to his life.  I'm not

5   saying that's dispositive here, but again it goes to who Andy

6   is, what his personal characteristic and circumstances dictate

7   that the Court think about when it comes to what efforts did he

8   make here.

9            Second, the Court can also consider Andy's role under

10  guideline Section 5K2.0, because again under Second Circuit

11  authority, it's clear that the U.S. Attorney's office does not

12  really have a vote, if you will, as it relates to assessing a

13  defendant's efforts with state or local law enforcement.

14  That's a decision for the Court.  And we have filed as you know

15  under seal some lengthy transcripts.  And again, I would be

16  happy to answer questions about them, including if there's

17  particular passages if the Court has questions about their

18  import or the value of that testimony.  But again, I do not

19  think it would be appropriate to do that in open court.  What I

20  would summarize at the end here is that there are sentencing

21  recommendations that have been made by both probation and the

22  U.S. Attorney's office.  I think it's fair to say that neither

23  of those recommendations take into consideration the extent or

24  value of what he's been able to do as it relates to state and

25  local law enforcement.

N4QBKOLS

1          And I would point out that obviously the trial is

2     scheduled.  It is pending.  Mr. Bannon faces serious charges.

3     I do not know if Andy will be a witness, in part because of the

4     stroke he suffered, and I'll talk about that in a minute; but

5     he stands ready to do so if that's the decision that the

6     prosecutors make.

7          There are two other major mitigating factors here that

8     I'd like to talk about briefly.  The first is Andy's health.

9     Andy suffers from a host of medical conditions.  You saw the

10     papers.  We submitted a declaration from his brother, who's

11     also his treating physician.  And we submitted it as a

12     declaration because we wanted it to be clear to the Court that

13     this was a submission of a medical professional, not his

14     brother.  This is someone who treats him.  He sends a separate

15     letter.  That wasn't a declaration.  And there's no question.

16     The government has never challenged that any of these

17     conditions are serious.  They never challenged that they're

18     going to be difficult for anyone to deal with.

19          As we noted in the memo, Andy suffered an ICH stroke

20     last year, which is a couple of months I believe after the

21     testimony.  Those strokes are quite deadly.  He was lucky to

22     survive.  And the statistics around these conditions are that

23     it's very unlikely, just statistically, that someone who

24     suffers one of these strokes will be alive five years

25     thereafter.  And it's unfortunately because these strokes

N4QBKOLS

1   reoccur.  Once you have one, you're likely to have another, and

2   we don't know how to stop that.  The government mentions

3   that -- they concede the stroke makes it much less likely

4   there's going to be any recidivism in this case.  And I

5   appreciate that acknowledge and I agree.  But to me, it's not

6   just a question of recidivism, because recidivism, that goes to

7   whether there's going to be any harm done in the future.  The

8   question for me is more one of justice.  If a man like Andy is

9   facing a varying certain medical future, and is more likely

10  than not that he will not survive a sentence of incarceration,

11  I think that's something that the Court should consider, and it

12  might weigh on my conscious.  And I think it would weigh on

13  anyone's conscious if you think about what's the fairest most

14  just way to resolve this case.

15          And lastly, Andy's family circumstances are, he's got

16  substantial responsibilities.  As the Court knows from our

17  memo, he lives today with his parents.  His father is a stroke

18  survivor -- not an ICH stroke I should point out, but he

19  requires substantial assistance, and Andy's able to do some of

20  that for him, not all of it.  I'm not trying to suggest that

21  Andy's a medical professional or a Vet.  He's got the capacity

22  to do that kind of work today, because he does not.  Andy's

23  struggling in many respects with his own personal life.  But

24  Andy's been a very important source of inspiration and comfort

25  to his son as well, who as I mentioned is here.

N4QBKOLS

1          Billy has completed that program that we referenced.

2    He is in sort of a probationary state as he works his way into

3    a halfway house and ultimately into -- back integrated into

4    hopefully Andy's home.  I think Andy's very proud of his

5    family, and he's very grateful for the support that they've all

6    shown.  As you saw from the letters, including from his father

7    and his mother, all of his sons and his brothers.  I know it's

8    a comfort to Andy to have had Billy to be able to drive up with

9    him today -- well, past few days.  And I hope Andy's able to

10   continue to have that kind of relationship with his son as he

11   moves forward with his life.

12          For all of those reasons, unless the Court has

13   questions about those other materials, I would respectfully

14   urge the Court to impose a sentence of probation.  There's

15   agreed forfeitures and restitution.  I'd suggest that there

16   should not be a criminal fine.  Andy doesn't have the ability

17   to pay.  And I'd urge the Court to find a way to have Andy be

18   able to spend time with his family and be able to have his

19   medical conditions treated in appropriates ways short of

20   incarceration.  And with that unless the Court has questions,

21   I'm prepared to sit down.

22          THE COURT:  Mr. Badolato, would you like to say

23   something.

24          DEFENDANT BADOLATO:  Yes, I would.  Yes, your Honor.

25   I sincerely apologize to the donors, this court, my family and

N4QBKOLS

1    all others involved.  I very, very deeply regret my actions.

2    Since the very beginning, I have been truthful, honest and

3    consistent with my lawyers, the SDNY, the state of New York and

4    myself.  I am blessed with a family and friends that have

5    forgiven me and stand by my side even though I have caused them

6    to suffer.  I beg this Court's forgiveness and place myself at

7    your mercy, your Honor, and special thanks to my son for

8    driving up here with me.  Thank you.

9          THE COURT:  Is there any reason a sentence should not

10   be imposed at this time?

11         MR. SOBELMAN:  No, your Honor.

12         MR. KRAMER:  No, your Honor.

13         MR. De CASTRO:  No, your Honor.

14         THE COURT:  As I have stated the guidelines range to

15   be used in this case is 51 to 63 months' imprisonment for

16   Mr. Kolfage, and 41 to 51 months' imprisonment for

17   Mr. Badolato.  Under the Supreme Court's decision in *Booker* and

18   its progeny, the guidelines range is only one factor that I

19   must consider in deciding the appropriate sentence.  I'm also

20   required to consider the other factors set forth in 18, United

21   States Code, Section 3553(a).  These include, first, the nature

22   and circumstances of the offense and the history and

23   characteristics of the defendant.  Second, the need for the

24   sentence imposed to reflect the seriousness of the offense; to

25   promote respect for the law and to provide just punishment for

N4QBKOLS

the offense; to afford adequate deterrence to criminal conduct;

to protect the public from further crimes of the defendant; and

to provide the defendant with needed educational or vocational

training, medical care or other correctional treatment in the

most effective manner.

          Third, the kinds of sentences available.  Fourth, the

guidelines range.  Fifth, any pertinent policy statement.

Sixth, the need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of

similar conduct.  And seven, the need to provide restitution to

any victims of the offense.  Ultimately, I'm required to impose

a sentence sufficient, but no greater than necessary, to comply

with the purposes of sentencing that I have just mentioned.  I

given substantial thought and attention to the appropriate

sentence for these defendants, in light of the Section 3553(a)

factors, and the purposes of sentencing as reflected in the

statute.

          On the one hand, the defendants committed a serious

offense.  In December 2018, through a crowd funding website

known as GoFundMe, Mr. Kolfage initiated an online fundraising

campaign that generated more than $20 million.  According to

webpage statements, the campaign planned to donate the money to

the federal government for the construction of a wall along the

southern border of the United States.  Within a month after

questions arose concerning Mr. Kolfage's background and the

N4QBKOLS

campaign's stated purpose, GoFundMe suspended the campaign,

warning Mr. Kolfage that "unless he identified a legitimate

non-profit organization, and to which those funds could be

transferred, the crowd funding website would return the funds."

Mr. Kolfage then involved Mr. Badolato in the

leadership of the fundraising efforts.  Defendants established

a none-for-profit entity called We Build the Wall to receive

the money contributed to the online campaign in order to fund

the private construction of a wall.  To persuade GoFundMe to

release the funds to We Build the Wall, Mr. Kolfage,

Mr. Badolato, and others agreed that donors would have to

opt-in to the rerouting of the money effectively causing We

Build the Wall to reraise the funds by convincing donors to

permit the transfer.  Mr. Kolfage and Mr. Badolato also made a

series of representations and assurances to GoFundMe, including

their commitment to put into place written bylaws, and a

promise that Mr. Kolfage would not be compensated from donor

funds.

Starting in January 2019, Mr. Kolfage and Mr. Badolato

in donor solicitations, public statements, social media posts

and press appearances promised donors that a hundred percent of

funds raised would be used for the construction of the Wall,

not a penny would be used to compensate Mr. Kolfage.  They also

said that the leadership of We Build the Wall and its advisory

board would not be compensated.

N4QBKOLS

1        However, within days of the launch of We Build the

2   Wall, Mr. Kolfage among others and Mr. Badolato secretly agreed

3   that Mr. Kolfage would be paid a $100,000 upfront, and then

4   $20,000 per month.  This monthly salary, along with other

5   payments began to pass to defendants through shell companies.

6   And then in October 2019, when defendants learned of a possible

7   criminal investigation, Mr. Kolfage and others took additional

8   steps to conceal their scheme, including ceasing payments,

9   using encrypted messaging applications and editing We Build the

10  Wall's website to remove the promise that Mr. Kolfage was not

11  being paid.

12        Between January and October 2019, We Build the Wall

13  raised about $25 million consisting of most of the $20 million,

14  which donors opted into transferring and newly donated funds.

15  By October of 2019, Mr. Kolfage had received more than $350,000

16  in donor funds, which he spent on travel, hotels and personal

17  credit card debt.  After engaging in this fraud, Mr. Kolfage

18  separately conducted an extensive tax fraud scheme in which he

19  repeatedly lied to the IRS to avoid paying taxes on his gains

20  from the We Build the Wall fraud.  But on the other hand, there

21  are mitigating factors that weigh in the defendant's favor.  I

22  will start with Mr. Kolfage.

23        At the age of 41, these are Mr. Kolfage's first

24  criminal convictions.  He had a difficult childhood.

25  Mr. Kolfage was the product of a broken home, struggled in

N4QBKOLS

1   school and eventually dropped out.  When he realized his life

2   was heading in the wrong direction, in January 2001,

3   Mr. Kolfage enlisted in the Air Force.  In 2003, he was

4   deployed to Kuwait.  On September 11, 2004, while stationed in

5   Iraq, Mr. Kolfage was struck with a mortar during an attack,

6   and as a result lost his legs and his right hand.

7          Based on his military actions and achievements, he

8   received numerous commendations, including the Purple Heart.

9   After his military service, Mr. Kolfage earned a college

10  degree.  Currently he spends much of his time volunteering for

11  various veteran's organizations.  The government agrees that

12  Mr. Kolfage's injuries, physical condition and health

13  circumstances are mitigating factors.  He suffers from several

14  medical conditions, has limited mobility in his day-to-day life

15  and requires assistance.  Mr. Kolfage continues to have the

16  strong support of his friends and family.  Valentine Cortes,

17  Mr. Kolfage's friend from the Air Force writes that Mr. Kolfage

18  "continues to be an inspiration for all that knew him.  It

19  takes a special kind of man to suffer through all his personal

20  and physical sacrifices and still remain a good father and

21  husband "  Danya Feltzin writes that he "is genuinely a good

22  man.  He is a dedicated husband, supportive father, and

23  reliable friend."  Brian Kolfage, Mr. Kolfage's father writes

24  that he is a "caring compassionate person." Several other

25  letters in Mr. Kolfage's sentencing submission state the same.

N4QBKOLS

1          Furthermore, Mr. Kolfage has taken responsibility for

2     his actions and expressed regret for his behavior as reflected

3     in his plea of guilty and his statements here today.

4          I now turn to Mr. Badolato.  Mr. Badolato is 58 years

5     old.  This is his first criminal conviction.  He suffers from

6     several medical conditions, including high blood pressure,

7     depression, and alcohol abuse.  Last June Mr. Badolato suffered

8     a stroke.  He now struggles with cognitive difficulties,

9     including problems with short-term memory and the inability to

10    find words.  Mr. Badolato maintains from close relationships

11    with his family.  After his stroke, he moved in with his

12    parents, who are in their late 70s.  He performs basic

13    household tasks and watches over them, and they also assist him

14    with his medical needs.

15         The Court has received two dozen letters in support of

16    Mr. Badolato.  Enoch Reynolds, Mr. Badolato's brother writes

17    that Mr. Badolato "is a very generous kind man."  Melissa H.

18    Badolato, Mr. Badolato's ex-wife writes that he is the "hardest

19    working person she knows." and "has always been a wonderful

20    provider for their family, not only financially, but also as a

21    well-educated adviser, mentor and parent."  Kenneth and

22    Patricia Badolato, Mr. Badolato's parents, state that

23    Mr. Badolato's moving back into their home has "blessing" and

24    he has "been a big help." Michael, William and Robert Badolato,

25    Mr. Badolato's sons write that he is "inseparable" from his

N4QBKOLS

1   grandchildren "a positive influence throughout their entire

2   life" and "has been such a great inspiration."  The Court has

3   reviewed over 15 other letters, and they all convey the same

4   sentiment.  Mr. Badolato has taken responsibility for his

5   actions and expressed regret for his behavior as reflected by

6   his plea of guilty and his statements here in court.

7   Mr. Badolato began offering information to the government and

8   expressed an interest in pleading guilty months before

9   Mr. Kolfage did.

10          The government states that Mr. Badolato provided

11   "timely and accurate information about the offense conduct."

12   Finally, the Court considers that Mr. Badolato had a lesser

13   role in the fraud compared to the other defendants.  He did not

14   misappropriate the stolen funds for his personal use, and did

15   not participate in creating the false backdated documents to

16   conceal the wrongdoing.  If there is ever a day in a person's

17   life when he's entitled to be judged on the basis of the

18   entirety of his background and contributions is sentencing.

19   And Section 3553(a) in directing the Court to consider the

20   history and characteristics of the offender is consistent with

21   that. The sentence I will impose today will credit Mr. Kolfage

22   and Mr. Badolato for their good qualities and recognize the

23   seriousness of their crimes.

24          Last October two individuals Bill Ward and Nicole

25   Keller, both victims of the fraudulent scheme testified at the

N4QBKOLS

trial of co-defendant Timothy Shea, who will be sentenced in
June.  Mr. Ward, the retiree from Gold Canyon, Arizona, who
served 21 years in the army, took the stand and stated that he
had donated a $100 to We Build the Wall because he believes
that Congress has failed to address the immigration problem at
the southern border.  Mr. Ward said "I just felt I'd been
cheated."

Ms. Keller, a 10th grade biology teacher from
Lancaster County, Pennsylvania, testified that she contributed
between 50 and $100 because her late husband was a border
patrol agent, and border security was an issue of great concern
to him.  She feels the same way.  Ms. Keller said "I was
insulted that somebody had taken what should be a position of
honor and valor, being injured for their country, and instead
used it to defraud me."

This was no ordinary financial fraud.  When Mr. Ward
and Ms. Keller donated their money to build the wall, they were
expressing their views about a political issue that was
important to them -- immigration.  Supporting We Build the Wall
was their way of participating in the fabric of our democracy.
It was a form of taking part in the political process.  But now
the infamous We Build the Wall scheme will no doubt have a
chilling effect on civic participation in the political realm.
Other American citizens may be reluctant to contribute their
money to support a candidate or an organization because they

N4QBKOLS

1    fear that the funds will not be used for the stated purpose.

2            A democracy means the engagement of ordinary citizens,

3    like Mr. Ward and Ms. Keller.  If we leave it up to battles

4    among politicians, corporations and the media, we risk losing

5    our democracy.  Currently what are the authoritarian

6    governments doing around the world?  They crush the press.

7    They suppress the vote.  They pack the courts, and they banish

8    civic organizations to prevent them from participating in the

9    political sphere.  For our democracy to work, we need to

10   encourage broad civic participation.  Mr. Ward and Ms. Keller

11   express one political point of view, but it does not matter

12   whether you agree with them or not.  All citizens have the

13   responsibility to inform themselves about the issues of the day

14   and to get involved.

15           The fraud perpetrated by Mr. Kolfage and Mr. Badolato

16   went well-beyond ripping off individual donors.  They hurt us

17   all by eroding the public's faith in the political process.

18   The fraudsters behind We Build the Wall injured the body

19   politic.  I conclude, therefore, for all the reasons stated

20   that a sentence within the guidelines range is merited for

21   Mr. Kolfage, and that a sentence below the guidelines range is

22   appropriate for Mr. Badolato.  Accordingly, I do believe a

23   variance pursuant to 18, United States Code, Section 3553(a) is

24   warranted for Mr. Badolato.

25           Mr. Kolfage and Mr. Badolato, I shall now pronounce

N4QBKOLS

1    your sentence.  Mr. Kolfage, it is the judgment of this Court

2    that you are sentenced to 51 months imprisonment for each count

3    in both docket number 20 Cr. 412 and docket number 20 Cr. 201

4    to run concurrently, and to be followed by three years of

5    supervised release for each count in both cases to run

6    concurrently.

7           Mr. Badolato, you are sentenced to 36 months

8    imprisonment, to be followed by three years of supervised

9    release.  Mr. Kolfage, I also impose a fine of $20,000 to be

10   paid in monthly installments of $500 starting 30 days after

11   your release from custody.  Mr. Badolato, there will be no fine

12   because probation reports that you're not able to pay a fine.

13   Although each of you must pay the mandatory $100 special

14   assessment which is due immediately.  The mandatory and

15   standard conditions of supervised release set forth on pages 50

16   to 52 of Mr. Kolfage's presentence report, and pages 36 to 37

17   of Mr. Badolato's presentence report shall apply.  In addition,

18   the following special conditions shall apply to each of you.

19          You shall submit your person and any property,

20   residence, vehicle, papers, computer, other electronic

21   communications, data storage devices, cloud storage or media

22   and effects to a search by any United States probation officer;

23   and if needed, with the assistance of any law enforcement.  The

24   search is to be conducted when there is a reasonable suspicion

25   concerning violation of a condition of supervision or unlawful

N4QBKOLS

1    conduct by the person being supervised.  Failure to submit to a

2    search may be grounds for revocation of release.  You shall

3    warn any other occupants that the premises may be subject to

4    searches pursuant to this condition.  Any search shall be

5    conducted at a reasonable time and in a reasonable manner.  You

6    must provide the probation officer with access to any requested

7    financial information.  You must not incur new credit charges

8    or open additional lines of credit without the approval of

9    probation unless you are in compliance with the installment

10   payment schedule.

11          If the probation officer determines based on your

12   criminal record, personal history or characteristics that you

13   pose a risk to another person, including an organization, the

14   probation officer, with the prior approval of the Court, may

15   require you to notify the person about the risk, and you must

16   comply with that instruction.  The probation officer may

17   contact the person and confirm that you have notified the

18   person about the risk.  It is recommended that you be

19   supervised in the district of residence.

20          Mr. Kolfage, the following special condition shall

21   also apply to you.  You must perform community service at a

22   rate of 250 hours per year for each of the three years of

23   supervised release to be approved, of course, by the probation

24   office.

25          Mr. Badolato, the following special conditions apply

N4QBKOLS

1 to you:  You will participate in an outpatient treatment

2 program approved by United States probation office, which

3 program may include testing to determine whether you have

4 reverted to using drugs or alcohol.  You must contribute to the

5 cost of services rendered based on your ability to pay and the

6 availability of third-party payments. The Court authorizes the

7 release of available drug treatment evaluations and reports,

8 including the presentence investigation report to the substance

9 use disorder treatment provider.  You must participate in an

10 outpatient mental health treatment program approved by

11 probation.  You must continue to take any prescribed

12 medications, unless otherwise instructed by the healthcare

13 provider.

14   You must contribute to the cost of services rendered

15 based on your ability to pay and the availability of

16 third-party payments. The Court authorizes the release of

17 available psychological and psychiatric evaluations and

18 reports, including the presentence report to any healthcare

19 provider.  Mr. Kolfage and Mr. Badolato, you are jointly and

20 severally responsible for paying restitution in the amount of

21 $25,601,650.  Mr. Kolfage, you are also responsible for paying

22 restitution in the amount of $143,000.  These payments are

23 payable to victims specified by the government in accordance

24 with the terms outlied in the restitution order, which includes

25 upon your release from prison, you shall commence monthly

N4QBKOLS

1    installment payments in an amount equal to 15 percent of your

2    gross income payable on the first of each month.

3          You must notify the Clerk of Court, the probation

4    officer and the United States Attorney for this district within

5    30 days of any change of mailing or residence address that

6    occurs or any material change in financial resources that

7    affects your ability to pay restitution while any portion of

8    the restitution remains unpaid.

9          Finally, I'm also required to remind you that as a

10   result of committing the offense alleged in Count One of the

11   superseding indictment, you shall forfeit to the United States

12   pursuant to 18, United States Code, Section 981(a)(1)(C),  21

13   United States Code, Section 853, and 28, United States Code,

14   Section 2461(c), any and all property constituting or derived

15   from any proceeds you obtained directly or indirectly as a

16   result of the violation, and any and all property used or

17   intended to be used in any manner or part to commit and to

18   facilitate the commission of the offense alleged in Count One

19   of the superseding indictment.

20         Mr. Kolfage, specifically that is a sum of

21   $17,782,106, and all right, title and interest of the defendant

22   and the following specific property:  $1,371,418 contained in

23   Capital One account number 3017095806 held in the name of We

24   Build the Wall, Inc. Mr. Badolato, specifically that is a sum

25   of $1,414,368, and all right, title and interest to any funds

N4QBKOLS

1  contained in Capital One account number 3027095806, held in the

2  name of We Build the Wall, Inc. Do the attorneys know of any

3  legal reason why the sentence should not be imposed as stated?

4          MR. SOBELMAN:  Your Honor, just one moment.  Your

5  Honor, just two brief amendments.  One with respect to

6  Mr. Kolfage because there are four counts, the special

7  assessment should be $400 rather than $100.

8          THE COURT:  I stand corrected. You're right.  It

9  should be $400.

10          MR. SOBELMAN:  And your Honor already issued a final

11  order of forfeiture with respect to other items of specific

12  property that Mr. Kolfage forfeited.  The docket number is 351.

13  One is $5,179.39 that was in an Anedot account held by We Build

14  the wall, and the second was real property in Sunland Park as

15  described in the Court's order.

16          THE COURT:  That is correct.

17          MR. KRAMER:  Your Honor, I had a couple of small

18  things.  It's not clear to me with respect to the restitution

19  order.  We had submitted an agreed restitution order which

20  included an apportionment of liability.  Is that being adopted

21  here?

22          THE COURT:  The one submitted by the government is

23  being adopted, yes.

24          MR. KRAMER:  I just wanted to be clear the

25  apportionment was part of the sentence.

N4QBKOLS

1          THE COURT:  Yes, it sets forth specific amounts.

2          MR. KRAMER:  And then two request is that we would

3     request given the Court's sentence that the Court recommends

4     that Mr. Badolato be assigned to the federal prison camp in

5     Pensacola, Florida, which would at least be closer to his

6     family; and that he be considered for participation in the

7     RDAP, Residential, Drug and Alcohol program.

8          THE COURT:  I will make both of those recommendations.

9          MR. De CASTRO:  Judge, I think answering your

10    question, no reason that sentence cannot be imposed.  I also

11    have a couple of recommendations, but I'll let you finish.

12         THE COURT:  The sentence as stated is imposed, both

13    sentences, all sentences.  Those are the sentences of the

14    Court.  Mr. Kolfage and Mr. Badolato, you have the right to

15    appeal your conviction and sentence, except to whatever extent

16    you may have waived that right as part of your plea agreement.

17    The notice of appeal must be filed within 14 days of the

18    judgment of conviction.

19         (Pause)

20         THE COURT:  My law clerk has pointed out that I may

21    have made an error with respect to Mr. Badolato's Capital

22    One -- I'm sorry, no. Mr. Kolfage's Capital One account number.

23    That account is 3027095806.  As I was saying, you have a right

24    to appeal your conviction and sentence, except to whatever

25    extent you may have validly waived that right as part of your

N4QBKOLS

1   plea agreement.  The notice of appeal must be filed within 14

2   days of the judgment of conviction.  If you're not able to pay

3   the cost of an appeal, you may apply for leave to appeal *in*

4   *forma pauperis*.  If you request, the clerk of court will

5   prepare and file a notice of appeal on your behalf.  I

6   understand that probation recommends voluntary surrender.  Have

7   the parties agreed to a date?

8          MR. De CASTRO:  We have not discussed that, your

9   Honor.

10          THE COURT:  Well, then I'm going to suggest May 26th.

11          MR. KRAMER:  Your Honor, may I request that

12   Mr. Badolato's date be set about 90 days out.  He was scheduled

13   to go for a surgery with respect to his stints in his heart,

14   and 90 days would give him time to recover and then report.

15          THE COURT:  That is acceptable.

16          MR. De CASTRO:  Your Honor, two things.  I would also

17   request 90 days, and the reason I would request that is first

18   of all, my experience with the BOP is they have to do a

19   determination as to where.  Obviously they make a designation.

20   It's much more complicated as it relates to Mr. Kolfage.  I'd

21   ask that the Court recommend that he go to a federal medical

22   facility. There's reference in the letter from BOP that they

23   would consider him for general population.  I don't know how

24   that's possible.  And I've had many clients with much less

25   medical issues that go to a medical facility, a hospital.  It's

N4QBKOLS

1    a prison, but it's a hospital.  And I know, at least I know

2    from experience that it takes them a while, takes much longer

3    than 30 days.  My experience is it's about 90 days, so I would

4    ask that the Court allow 90-day surrender, assuming that the

5    Bureau of Prisons is able to assign him.

6          THE COURT:  I will permit 90-days, period, and I will

7    recommend a medical facility, but the outside date is 90 days.

8    Are there any further applications?

9          MR. SOBELMAN:  Yes, your Honor.  At this time, the

10   government respectfully request that the opens counts as to

11   these two defendants be dismissed.

12         THE COURT:  They are dismissed.  Mr. Kolfage and

13   Mr. Badolato, good luck to you.  The matter is adjourned.

14         (Adjourned)

15

16

17

18

19

20

21

22

23

24

25